Research v. Federal Communications Commission. Thank you, and may it please the Court. The Supreme Court has long held that Congress must clearly delineate the boundaries of power delegated to an executive agency. The admittedly unique revenue-raising scheme for the Universal Service Fund flunks that test, and you need look no further than the arguments the FCC itself has long made and that this Court has adopted. First, that the Section 254B Universal Service Principles are merely aspirational and that the FCC can redefine universal service. Second, the ones that the FCC balances, those general, that policy determination is largely unreviewable by the courts. And third, that the FCC can both under- and over-raise money for the Universal Service Fund. Facing a non-delegation challenge, however, the FCC backtracks from those positions, but this Court's precedent is correct. Now, the Supreme Court has never upheld a revenue-raising delegation absent some kind of objective statutory limit on the agency. Here, not only is there no objective limit, but the statute is like the one the Supreme Court addressed in Schechter Poultry and Panama Refining. It lists lots of vague, broad, competing policies with no statutory guidance and an executive limited largely by its own self-restraint, which the Supreme Court said in Whitman is really no limit at all. In fact, the statute here is even worse than in those cases because of that dual-layer delegation where the FCC can redefine universal service. In short, Congress delegated the power to an agency to decide how much money to raise for a nationwide social program, and the FCC has taken that power and run with it. Just last week, for example, the FCC announced a new record high rate for the fourth quarter of this year, 34.5%. No wonder scholars have said that this scheme is unique in the statute books, and if replicated, Congress would never have to appropriate funds or pass a budget again. A single sentence would probably do. Quote, the IRS shall raise sufficient money for the entire federal government equitably and in the public interest, period. Under the FCC's view, that statute's constitutional, but we'd have an entirely self-funding and unaccountable executive. All of these are before we even get to the private non-delegation issues with this case. There's not even a pretense of independent review by the FCC of USAC's quarterly rate determination, which obligates Americans to pay nearly $10 billion a year. The entire process happens by default, and as the panel decision recognized, it plays out on the eve of a new quarter, largely leaving the FCC with no choice but to accept USAC's proposal. That's not a private non-delegation violation. It's hard to see what would be. For these reasons, the Court should grant the petition and hold that the Universal Service Fund Revenue Raising Scheme is unconstitutional. Mr. McOtter, if we were inclined to agree with your non-delegation claim, and this is not foreshadowing, this is just a question, what is the proper scope of the remedy? Would only the present plaintiffs get relief? Should that relief only be extended to a single quarter's rate? What is the relief that would be appropriate and why? The petitioners have stated repeatedly in their briefs, Your Honor, that they are happy with the relief being limited only to the named petitioners. I think there are about 10 of them. Obviously, this case addresses only one quarter, so the Court would be addressing only that one quarter, only for those named petitioners. The declaratory relief itself is the most valuable because the FCC continues to issue these quarterly rate determinations going into the future. I think beyond that, Your Honor, it's largely dependent on exactly how the Court structures its decision. The Court could, for example, remand to the FCC. The Court could vacate the decision only as to the named petitioners. I think it does depend a little bit on how the Court rules. Thank you. Now, the FCC raises several arguments in response to the points that I made in my introduction. However, none are persuasive and the Court should reject them. Their primary argument, one they make throughout their briefing, is that there can be a non-delegation  in other words, only if the FCC could raise any amount from anyone for any purpose. But we know that can't be the right test. The test the Supreme Court has laid out is whether Congress has clearly delineated the power delegated, not whether Congress has given absolute power. Congress itself, of course, doesn't have that kind of absolute power and, of course, couldn't delegate it. And that's played out in the case law from this Court and from the Supreme Court. In Jharkhand, for example, it would have been quite easy for the agency to violate that statute, for example, by bringing an enforcement action in state court. In Panama refining, the statute addressed only hot oil, a subject matter that the Court said is defined and objective. It would have been quite easy for the executive to go beyond that subject matter, didn't save the statute there. Perhaps the closest analogy here would be Schecter Poultry. The statute there prohibited any codes adopted by the President from discriminating or being inequitable. Pretty close language to what we see in Section 254. Again, that didn't save the statute there. The FCC also argues that like in Panama refining, there are lots of policies in Section 254. It's a long statute. There must be a policy in there somewhere. There must be an intelligible principle in there somewhere. But just like in Panama refining, which had 10 sections of policies, if anything, that makes the situation worse because it means the executive is free to choose among that long list of vague, precatory, competing interests. When you look closely at Section 254, almost every provision is framed as something the FCC should do or consider doing. There are almost no actual substantive mandatory limits as the FCC itself has long argued to this Court and that this Court has agreed with. The FCC also argues that phrases like, in the public interest, are the best that Congress could do. Our brief lists half a dozen easy ways that Congress could solve the non-delegation violation here. We would point, for example, to Skinner, which likewise involved what might be called a technical issue, pipeline safety. There, Congress had no difficulty whatsoever imposing an objective limit. Congress has no difficulty imposing limits for Social Security taxes, IRS tax brackets, anything like that. So Skinner, in our view, rejects the FCC's argument that vague phrases like, in the public interest, are the best Congress can do. And the Supreme Court's decision in NCTA, which also involved the FCC, by the way, also rejected the argument that agencies could raise money based on vague phrases like, in the public interest. They said that would raise a grave delegation concern to have agencies in search of funding  for the FCC. And here's the final point on this, Your Honors. Even if some of you are inclined to disagree with those points that I've made already, the Court should still rule in favor of the petitioners for two reasons. First, there is that unique dual-layer delegation where the FCC can redefine universal service and add new universal service principles. The only case we could find raising a similar dual-layer delegation was Schechter Poultry, which allowed the President to pick and choose and add from and take away from codes. This Court in the CFPB funding case, the Supreme Court and Free Enterprise Fund, admittedly not a non-delegation case, but the Court said in those cases that the second layer makes a difference from a constitutional perspective. So for those reasons, and dual-layer delegation and also the fact that the statute so closely tracks the problems in Schechter Poultry and Panama refining, even if the Court disagrees with our distinction between revenue-raising statutes and other kinds of statutes, the Court should still grant the petition and find the universal service fund to be a non-delegation violation. The FCC, in its briefing, has cited to the Supreme Court's decision in Whitman the line in there that says Congress does not have to decide how much is too much, and I've got three responses to that point. First, Whitman, of course, was not a revenue-raising statute. We make that argument. That's a distinction. In our view, the Supreme Court itself has said that's a distinction in NCTA. Second, remember in Whitman, the statute said that the EPA must set particulate levels at a level that would be requisite for public safety. The Supreme Court, largely relying on a DOJ concession, said the word requisite means floor and ceiling. That's not the case here, though. The statute here uses the word sufficiency, and it largely uses it in provisions that the FCC itself has said is aspirational only, which means the FCC can over-raise and under-raise. It's not a floor, and it's not a ceiling either. And third, even if you did interpret Section 254 as requiring the FCC to raise just enough, not too much, not too little for universal service, the phrase universal service itself is so vague in its definition that it's almost meaningless. Remark 254 defines universal service as an evolving standard that the FCC then gets to set and reset over time. Counsel, can I ask you a couple questions? What would be your best record site for the proposition that the USAC's subsidy rate calculations are not ministerial, in other words, not subject to FCC data, direction, and control? What's the best record site in this record proving that these aren't ministerial actions taken by the USAC? So I think somewhat ironically, Your Honor, that there is no such record site because the Commission never even issues a separate document saying we've looked at USAC's numbers, we agree with them. But what would you point to to show that this private entity is making determinations itself as opposed to crunching the numbers for the FCC? Is there a record site you would point us to? I would instead, Your Honor, I think point to this Court's precedent. Okay. That's fine. I don't mean to interrupt. We just — you have limited time, other people. So without a record site, the two legal questions I would ask you is do you have a case — what case best stands for your assertion that these subsidies are, in fact, taxes? Because to my eye, that is in tension with Texas utility, the footnote you're aware of. So number one is do you have a case — what case would you say helps us most to label these as taxes, not subsidies? And the second level question is even if they are taxes, are you arguing that there's a is of taxing power, which seems to me in tension with Skinner? Do you understand the two questions? I believe so, Your Honor. On the first question, how to determine whether it's a tax, I would point to this Court's decision in Trafigura, which itself cites many cases like U.S. Shoe, which is a Supreme Court decision. I would also point to the Supreme Court's decision in Skinner, which largely they ask whether the recipient is receiving what you might call kind of a quid pro quo, a legal quid pro quo. Someone asks for something from the government, and in exchange for that something, they pay a certain amount of money. That asks whether it's a fee. Now, here, the money that the government collects from carriers is not in exchange for any particular quid. There's no quid pro quo. The money gets redistributed just like any standard tax would. So that's why, in our view, it is a tax. Thank you. On the question of whether we're arguing that taxation is subject to a heightened scrutiny, in our view, at most, what Skinner held at 220 and what it rejected at page 220 was that taxation is not delegable at all or is subject to a much stricter test. That's the language the Court used, I believe. So as we argue in our brief, we think that's probably dicta, to be honest, but even if it's not, in our view, that's all Skinner said, that it rejected the argument that taxation power can't be delegated, period, or that it's subject to a much higher test. It didn't purport to overrule, and in fact, I think it may have restated the view that what suffices as an intelligible principle will vary based on the context. Whitman certainly said that in clear language. And so I think the way to harmonize those cases is to say that a taxing delegation, like a revenue-raising delegation, in our view, does require some kind of objective limit to show that Congress itself set the limit rather than the agency. I wouldn't call that a much stricter test, which at most, in our view, is what Skinner rejected, and I wouldn't say that runs afoul of Skinner's argument that taxation can't be delegable at all. If I could, Your Honor. On the non-delegation issue, you seem to carefully avoid asking us to overrule Rettig. You cite Rettig several times, but all but once that you cited, you're actually citing Judge Ho's dissent. I'm just curious, obviously, if you think the dissent was correct, that means the majority was wrong, why is it that you have not asked us to overrule Rettig? We certainly think the dissent was correct for what it's worth, Your Honor, but we don't think the Court would need to overrule Rettig, at least as I read the case, the panel opinion, because in our view, Rettig is most relevant to the private non-delegation argument, and what Rettig said is that the agency still must conduct an independent review on the back end. Now, in Rettig, the Court said that that requirement was satisfied, and that it was a small part of the process, closely superintended by the agency. It was merely a request for input. That's all the language from Rettig, Your Honor, but here, USAC determining the quarterly tax rate is certainly not a small part of the process. It's largely the process itself, and as we've argued, it's not closely superintended by the FCC, certainly not on the back end. There's no indication whatsoever, and that's kind of my answer to Judge Higginson's first question, which is there is no record site to show that the FCC is actually reviewing this. So just to crystallize your position so we'll understand it, was Rettig rightly or wrongly decided, and again, you're saying that we should not overrule it. That's two different questions. I would . . . we would probably say it was wrongly decided, but the Court, in our view, doesn't need to say that in this case. We think that even under the panel opinion in Rettig, this is certainly a private non-delegation violation, Your Honor, because the situation is just so much different. The role of the private party is so much more dramatic. It's so unchecked. It happens at the quarterly deadline where the agency can't review it even if it wanted to, and so I would obviously defer to the Court in terms of what it thinks it would need to do with its own precedent, but in our view, the Court wouldn't . . . But you're not opposed to it? I would not be, no. Your answer to Judge Higginson's question about where do the private actors dictate the price, you said it would be in the . . . it would be in the record . . . not in the record sites, but in the case law, and you were going to give us some case law for that. Could you please elaborate on that? Yes. Thank you. I appreciate that, Your Honor. What I was going to say was that this Court, in TOEPUC No. 2 at page 328, said that the decision of how much money to raise is an imprecise exercise. It said at page 322 that Section 254B, the universal service principles, delegate, quote, difficult policy choices. So in our view, language like that explains how there's no kind of scientifically determinable exact measurement for how much universal service funding is needed, if for no other reason than the fact that the term universal service itself is so vaguely defined and can be redefined by the FCC itself. And remember, in TOEPUC No. 2, at that same page, 328, this Court chided and vacated an FCC decision for giving, quote, near total deference to a private proposal, end quote, and that was on the amount of how much money to raise for the universal service fund. What is your best straight-on argument that the intelligible principle here is satisfactory under cases like Gundy, that it's, you know, that you would take it on, that it's not satisfactory? All right. So under Gundy, I think it's actually to our advantage to compare this case to Gundy. What the Supreme Court did in Gundy was interpret the statute to say the Attorney General was required to apply SORNA as soon as possible. So what would that be like if we could take Section 254 and apply it to kind of the SORNA context? It would mean that the Attorney General gets to decide when to apply SORNA. The Attorney General gets to make that decision based on principles that are aspirational only, like Section 254b, and then that Attorney General can even redefine what sex offender means, FCC can redefine what universal service means. So I think it actually helps us to compare this case to the plurality in Gundy, where the Court was able to interpret that statute as severely constraining the Attorney General's discretion. Essentially, they read it as imposing several mandatory obligations that the Attorney General had to carry out as soon as possible. Here, you struggle to find anything mandatory in Section 254, and even if there were, again, as we've said, the FCC can just redefine universal service. It can add new universal service principles, which was certainly not a power the Attorney General had in Gundy. So we think that the cases that we've cited, like Structor Poultry, Panama Refining, those all are cases that are analogous to what we've got here. The cases where the Supreme Court has rejected non-delegation arguments are distinguishable. Largely, as I've said, they haven't involved revenue raising. But even if the Court disagrees with that distinction, none of them involve the dual layer delegation that the FCC has here. And so, in our view, this is the way to harmonize all of these cases, harmonize J.W. Hampton, Skinner, Gundy, Whitman, all of them, in terms of the limits on the FCC's revenue raising power. I did want to respond briefly on the private non-delegation on one extra point that hasn't come up yet during today's argument. The FCC argues that there's a regulation, 54.719B, where the FCC can review on the back end individualized challenges to USAC determinations. Just to be clear, that's not for challenging the quarterly taxing rate itself. That's just where a particular carrier says, no, no, USAC, you miscalculated our income, our revenue, for a particular quarter. It wasn't that amount. It was a different amount. And USAC rejects that. The company can take that up to the FCC. That's not a meaningful substitute for reviewing the actual quarterly taxing rate that USAC sets each quarter. Unless there are any further questions, I'll reserve my time. Thank you. May it please the Court. Jacob Lewis for the Federal Communications Commission in the United States. Plaintiffs' non-delegation, petitioners, excuse me, non-delegation claims fail because Section 254 provides the FCC with ample guidance as to how to implement the universal service program and how to collect the funds to support that program. Their private non-delegation, private delegation claim fails because USAC, the administrator of universal service, does not exercise regulatory power. It does not make policy. And in any event, the FCC oversees USAC at every turn. Non-delegation claims, as this Court and the Supreme Court have recognized, start and often end with an examination of the statute. And I'd like to go through Section 254, at least the highlights, or not for delegation purposes, if I might. 254B instructs the FCC to base policies for the preservation and advancement of universal service on a number of principles. But the first thing to note about that provision is that it instructs the FCC that the task before it is preserving and advancing universal service. That's a well-settled concept. It was in place. It's a bulwark of communications law that was almost at the inception of the Commission itself, because Section 1 of the Communications Act talks about the FCC's obligation to provide telecommunications to all parts of the country. And that's what universal service is intended to do. MR. MILLER Mr. Lewis, if I may interrupt you, you identify the concept of universal service as the, I would say, the target of the statute. Congress has said that's the target we're aiming for, universal service. MR. LEWIS Yeah. MR. MILLER So who, I guess I have a couple of related questions. Who defines universal service? And can that definition change? And if it can change, who gets to change it? MR. LEWIS So the statute answers the question. 254C instructs the FCC that universal service is an evolving level of telecommunications. And that's because it also, later in the same section, the Commission is to take it into account that universal service is the definition of services that are supported by a universal service program. It sets forth, again, a number of principles, a number of factors that the Commission is to take into account. The Commission is to consider the extent to which such telecommunications services, A, are essential to public health, education, or public safety, B, have, through the operation of market choices by consumers, been subscribed to by a substantial majority of residential customers. MR. MILLER So do I understand the answer to that? MR. LEWIS The Commission is supposed to look at these factors, including the market. And so, in answer to Your Honor's question, the Commission looks to its authority under 254C. MR. MILLER So if I understand that, I mean, that's helpful. And I've read the statute, too. The Congress has said that the Commission gets to define what universal service is. And it is, by definition, an evolving concept. MR. LEWIS So, yes, that's correct, Your Honor, although there is a lot of water under the bridge with regard to that concept. So the Commission—excuse me—Congress understood that that history is also part of the context that the Commission would take into account. Indeed, 254J recognizes specifically that nothing in the statute was supposed to change the existing lifeline program that the Commission was already administering to advance these universal service programs. So, yes, the Commission—Congress specifically gave the Commission the authority to identify the services subject to universal service, recognizing that those would change over time in light of technology. MS. PATTERSON Well, could you just explain to us a little bit, Mr. Lewis, how the budget for universal services has increased from $600 million to $9 or $10 billion annually? Just what—I mean, it sounds as if it's becoming more and more universal. Does that mean satellite phones for everyone? Does it mean it's giving out cell phones? Does that mean it's wiring? It's paying for retrofit wiring to be done in schools? What accounts for this explosion of the evolving definition? MR. LEWIS Well, I think the early years, there was an expansion. By the way, I think from the—one of the amicus briefs in support of petitioners lays out a chart for the size of the fund, which has, over the last decade or more, remained relatively stable at the $8 billion mark. So, it's a little— MS. PATTERSON $10 million a year is not chicken feed when it's— MR. LEWIS No, no, not at all, Your Honor. MS. PATTERSON It's not, yes. MR. LEWIS But that just is a recognition of the importance of the goal of universal service. And after all— MS. PATTERSON I'm asking—I'm asking for facts. I'm not asking for theories or hypotheses. I'm asking just what are these services— MR. LEWIS Well— MS. PATTERSON —that have evolved from such a little chicken? MR. LEWIS Originally, before the 1996 Act, we were talking about—or even in the olden days, let's put it that way—telephone service. MS. PATTERSON Right. MR. LEWIS But there are many different ways that people communicate these days. And so wireless telephony, wireless voice telephony, became more and more important during this period of time and is one of the services that is supported. In schools and libraries and rural health care, Congress specifically identified internet connections as a supported service. And that was actually an issue in the Topic 1 case. So over the years, there's been a recognition, both by Congress and the Commission, that in order to give telecommunication service—  PATTERSON I understand that. But how much has the FCC expanded the services? When you say wireless, does that mean—to be universal, you may as well give everybody a cell phone. Is the FCC's subsidy supporting cell phones in certain areas? MR. LEWIS Yes. I think in certain areas—look, there are four programs. One is—among them is a high-cost program that provides telecommunication service in areas where it's very costly to build out. So the subsidy is necessary to reach those. PATTERSON Does it do satellite communication services? MR. LEWIS I don't think under the universal service program that satellite services are supported. There are other programs that subsidize broadband and the Commission—  MR. LEWIS Right. PATTERSON —universal service fund.  LEWIS But, Your Honor, if I might, the issue in this case is whether Congress has given the Commission sufficient guidance in the statute. It's not whether the Commission has properly adhered to that guidance, I guess I would say. MS. PATTERSON Let me ask you—well, that's part of what the scope of the delegation entails. Can we really define what the scope is? For instance, we have vigorous discussions now about generative artificial intelligence as the wave of the future. I assume it's fairly expensive, as the Internet must have been at one time. So can you foresee generative AI being made available in the schools and the public health area and so on? MR. LEWIS I'm not sure I can tell you about what is going to happen with AI in any respect, Your Honor. But I will say that the Commission, if it were to support another service, would have to jump through all the hoops that are set forth in 254. MS. PATTERSON I understand that. But then you have your group, your USAC group, which is—it looked like to me the USAC group is some of the communications companies, but it's also a lot of the people who stand to benefit from the subsidy. So there's no incentive to save money or redirect the money in a more efficient way, which is why you have this astonishing 34.5 percent surtax, right? MR. LEWIS Well, the contribution—two things, Your Honor. First of all, USAC's task is very targeted. USAC is bounded by all of the Part 54 regulations. MS. PATTERSON I'm sorry. For the beneficiaries of the program to have a major seat at the table in deciding what they were going to receive. MR. LEWIS Well, Your Honor, the Commission oversees USAC. So if USAC were a FOX, and the Universal Service Fund was a hen house, I guess the Commission is the farmer that makes sure that FOX doesn't— MS. PATTERSON Well, if Universal Service means that the farmer is supposed to be able to if he needs it, then there is some level of service that the ordinary residential consumer should not be required to subsidize, right? Which means USAC has the beneficiaries. It doesn't have the paying public. MR. LEWIS I'm not sure that's correct, Your Honor, but the fact is, for purposes of the claim, the question is whether the FCC is overseeing USAC.  PATTERSON And give us some concrete examples other than the .001 or whatever it was, change in the rate that FCC affected at one time. MR. LEWIS The structure of the regulations is the following with regard to the contribution. MS. PATTERSON But I didn't— MR. LEWIS I'm going to give you the system and the task that USAC has. USAC has two things to do with regard to the contribution factor. One is it collects from carriers what their projected revenues are going to be for the next quarter. That's the contribution base. Then it also projects what the needs of the fund are going to be. MS. PATTERSON Exactly, which is the beneficiaries have their handout, and they say, we need this, we need that. MR. LEWIS But there is no blank check there because that determination is made in light of the multifarious FCC regulations that describe the boundaries of what services are eligible for universal service. MS. PATTERSON What group at the FCC specifically oversees the USAC in order to go through this to determine how the projected revenues match the needs of the fund? I don't know that the record indicates that there are any specific employees or division or that there's any—it seems like this would be a very important function for the FCC to oversee, but I don't see any evidence in the record—perhaps I've missed it and you could help me—that they have some significant division working on this because it is so much money and so important to get it right.  LEWIS Well, among the divisions of the Office of Managing Director, and at page 100 of the J.A., you will see that the contribution factor is announced in a public notice. MS. PATTERSON Right. They just announced the number. MR. LEWIS They make the calculation, too. MS. PATTERSON Right, but that's a numerical calculation. That's not a policy decision to figure out if the USAC got it right and if that's consistent with the FCC's goals under Congress's delegation.  LEWIS Well, Your Honor, that function—so two things. One is USAC is required to submit its projections of demand for the Universal Service Fund 60 days in advance of the next quarter. Now, there's only 90 days in a quarter. Submitting it 60 days in advance is taking—USAC basically has to spend—is get that number in 30 days, and then the Managing Director and other FCC staff have that 60 days to look at those projections to make sure they're in line. And the regulations state— MS. PATTERSON So the Managing Director, how many people does the Managing Director have on this? MR. LEWIS I don't know, Your Honor. There are hundreds of people. MS. PATTERSON Well, to be a little more pointed, the fund that FCC routinely approves is how many times—20 times larger than the entire regulatory budget. So it sounds—  LEWIS I don't know that the two numbers are relevant—have the same relevance. The need—the— MS. PATTERSON Well, excuse me, but the need for oversight ought to be just as great in either case. And if you can't even identify a particular age—you know, group within FCC that supervises this behemoth, it's very difficult to see how any supervision is actually occurring.  LEWIS Well, Your Honor, I did identify the Managing Director's office. There was also the Wireline Competition Bureau. There are any number of staff that are dedicated to this precise process. We have—and if I just might explain the process, the 60 days in advance, the projections for the demand for the fund. Thirty days in advance is that number on the contribution base. So there is ample time for the Commission to look at those numbers and make sure they're in line with the eligibility requirements that the rules set forth. And by the way, if for some reason USAC collects too much money, the FCC's rules make clear that that rolls over to reduce the contribution factor in the next quarter, which is exactly what happened in the last couple of quarters. MS. PATTERSON Yeah, Counselor, can we—can we go back? LEWIS I want to—I'm sorry. I want to make a point. We've been talking about setting the fees and how much money will be needed prospectively in the 60 days. My question is more on the back end. What sort of supervisory authority and how much detail does the FCC get into with regard to monies that have been spent, the USAC has spent, to make sure that those funds have been properly consumed at whatever level that they've been allotted? So among—one thing is that the rules specify that there's an annual audit in 47 CFR 54.717, if you want the exact site. But there is an annual audit so that for precisely that point, and the managing director can take corrective action if the audit uncovers an overpayment or some other ineligible payment. So that, again, another protection in the system that is embedded in the rules. Look, the requirement for a private non-delegation, a private delegation, is one of two things. And both have to be satisfied. There has to be an exercise of regulatory power. What the USAC is doing with regard to the contribution factor is collecting the data, collecting the numbers. It's a straightforward task. The rules say specifically that the administrator is responsible for billing contributions, collecting contributions, and that USAC does not make policy 54.702C. And if there's any question, USAC comes to the commission. But doesn't USAC set the needs? Sorry, excuse me? Doesn't USAC set the needs? It projects the needs in light of the regulations. So USAC can't just pick a number out of thin air without regard to all of the regulations that specify how these services are to be supported and what services. When does universal service, what happens, when is it achieved? Well, it's one thing. I suppose it's achieved with regard to a particular service when everybody around the country. When does that happen? Well, I don't know when that happens. I mean, we've been working on this for quite some time. I just wonder, is there any end date in sight? Does USAC ever project that this will end? Or will it just grow ad infinitum? Well, I don't think Congress understood this to be a program that had an end as specific. But the goal is universal service. Sorry, what's that? The goal is universal service. What happens when everybody has universal service? Well, then I suppose in that halcyon day, then the program, there would be no need for that. So it's an unachievable goal. It will just go on forever. And there's no real impulse to actually achieve it. Well, I think that's unfair, Your Honor. Tell me how. I'd point to the, for example, the high cost program, which includes trying to get telecommunications on, for example, very remote areas, areas like Alaska, and also tribal lands, where that really has proved to be an extremely, even if it's the last 3% of the population of the United States, a very difficult task. And a task that the commission has been at, and Congress has been at, for many years. I get that. I've been to the Bering Sea, and I've actually been to some of those villages. I get how remote that is. But it reminds me of what my grandmother used to say. We can put a man on the moon. Why can't we achieve this at some point, date certain? I guess what I'm just wondering is this is spun into eternity, and it will always be growing and going. Or is anybody actually trying to achieve universal service? Well, I think this whole case is about the commission's effort to achieve that. But if I could bring the court back to the issue in the case, which is whether Congress has provided enough guidance to the commission in administering the program. And I think that if you look through 254, you see not only one intelligible principle. The D.C. Circuit said preservation and advancement of universal service was itself a sufficient intelligible principle. But you also see Congress's instruction that the commission, with regard to contributions, that they be equitable and non-discriminatory. The commission shall, Congress instructs. Counsel, could I ask two questions? One, I think, is a fact question. Opposing counsels describe this private sector arrangement as unique. Can youth, obviously, agencies contract with private entities all the time? Is there one that comes to mind as comparable? That's my fact question. Some other agent private contracting arrangement that you think is similar? That's question number one. Now, question number two is, you didn't cite the removal clause case from three years ago, SELA law. You may be prepared to discuss it. And if you have familiarity with that case, one possible read of that case is things that, individually, might survive constitutional analysis. In aggregate, wouldn't. So non-delegation to private sector involvement to maybe a tax. So the two questions, that's a factual question at the outset, comparable agency private contracting relationship. Second one, do you even know SELA law? And could you discuss or give your thoughts on whether, in aggregate, we have a problem, even if we don't in disaggregate? Well, let me start with the first. No particular arrangement comes to mind, although there are plenty of arrangements in the federal government where the government delegates ministerial or straightforward tasks to agents and oversees those tasks. So look, as far back as Sunshine Anthracite Coal in the 1930s. I don't mean to be rude, but I was as abrupt with opposing counsel. If no particular analysis comes to mind, why? One does not come to mind. Okay. So then the second question just. The second question about the aggregate. I know SELA law. I don't know that it directly applies here, but to your point about infirmities in the little infirmities in the aggregate. First of all, I would say there are not infirmities to be totaled up here. I think that there is the 254 in Congress's instruction amply satisfy the intelligible principle standard for delegation purposes. I think that petitioner's argument that somehow there is a higher standard with regard to revenue raising is directly foreclosed by Skinner, as Your Honor's previous question to opposing counsel said. I think that his argument that somehow with regard to revenue raising, a principle isn't intelligible unless it has a hard cap is not worn out by Whitman, which says that the court has never required a determinate criteria and also not worn out by Supreme Court cases like Lichter or Grimaud where there was revenue raising at issue and no cap. Counsel, can we talk about the private non-delegation doctrine for a second? So I assume you would agree, yes or no, that Congress has to say something to authorize an agency to delegate power of whatever kind to a private company. There has to be something in the statute. Some within the agencies, of course, although I think that that's a general, I think it would be a general presumption that an agency can delegate ministerial tasks. So that's, I mean, Carter Cole obviously says the opposite, right? Carter Cole says the opposite, which is that you can't just presume. The delegation was regulatory power. There's no, our point here is there is not regulatory power. Do you, so are you going to take the position that without anything else, without ever saying anything in the statute, an administrative agency exercising delegated power from Congress could just choose to exercise that power through a private company without any guidance from Congress? I want to be clear on Your Honor's question. I do think there is a problem if an agency delegates governmental power or its regulatory power to a private party. And to Your Honor's point, you would probably need an authorization from Congress. I don't know the same is true if you're not delegating regulatory power. What would be your best case for the idea that without any support whatsoever in the statute, never mentioning private companies, never saying anything about private companies exercising power, what we can dispute all day, whether it's a tax revenue raising, is it simply ministerial? If it's ministerial, why do you care? Why can't you just do it in-house? We could dispute that all day. But what would be your case for the idea that an administrative agency with zero statutory guidance can just authorize a private company to exercise power of whatever label? What case says that? I think the label is important, but look, the United States government uses contractors and agents all the time. Counsel, I'm just trying to get a case from you. And obviously, the fact that there are MOUs and contracts with private companies doesn't say that you get to put a 30% tax on every American cell phone bill. So I'm trying to understand what case says that an administrative agency can choose to use a private company to exercise fill-in-the-blank power. We'll use whatever label you want. What case says that? Sunshine and Anthracite certainly doesn't. I don't know. I think that Sunshine and Carter, the problem with those cases was the delegation of regulatory power. So I guess I would say that the flip side is true, that those cases stamp the proposition that you can delegate or employ an agent to assist the agency in performing ministerial functions. But I would say, Your Honor, that Congress here in 254 did authorize the FCC to establish mechanisms to support universal service. And does that alone say... So if an administrative agency has the power to, say, set clean air standards, they could just delegate that to Exxon? I don't know whether they could delegate it to Exxon, but it's certainly... This USAC is not Exxon, and the question would be whether or not the agency is overseeing. So, for example, if they delegated... Using the word delegate may be misleading here. If they hired an accountant... Counsel, I understand. But all of the cases that talk about supervision, right, that all of this idea about whether the administrative agency is supervising the private company comes from Carter Coal, it comes from Sunshine Anthracite. In both of those cases, Congress talks about the private entity in the text of the statute. If you look at Sunshine Anthracite, the code, the commission of coal companies, is mentioned in the statutory text, and you don't have that. And so what I'm trying to understand is what case... If Sunshine Anthracite is your best private non-delegation case, what else do you have to say... I mean, you let off the whole argument with, it's all about what Congress says in the statute. Where in 254 would any reasonable person look to say, Congress contemplated that we were going to give this power to USAC? Whatever you want to call the power. Well, in 254b-5, the commission is supposed to consider among the... That there should be specific, predictable, and sufficient federal and state mechanisms just to preserve and advance universal service.  Well, Congress basically left it to the commission, to Your Honor's point, about whether to keep this in-house or because it was a complex data collection task that the agency could have, that the FCC could have determined was best performed by a dedicated organization, that to leave it to USAC, to establish USAC to do that. So I don't have a case? No, I have the statute, Your Honor, yes. Very good. Thank you. Counsel, may I ask you a question? Yes. If I got a cell phone bill and it said there was a line on it for universal service charge, I don't know if there really is or not, but let's say there's a line on my bill and I pay it. Am I paying for something I received, some service that I received, or am I paying for someone else to receive a service? Well, first of all, Your Honor, not everybody sees that line item because not all carriers pass through them. So the ones who do? I think you are paying for the support of the network that comes from the universal service program. So you benefit, I guess, the consumer benefits from the fact that the network is robust, but the carrier specifically benefits because that support allows them to reach more consumers. I mean, wouldn't the average consumer, when explained this program, say, oh, I understand what I'm paying for. I'm paying for someone in a rural area to be able to get internet. Among other things, but I'm paying for that library to have a Wi-Fi that I might be able to go and sit outside and connect to the internet if I don't have the internet in my house or that I'm doing homework or something like that. So, and by the way, Your Honor, I think this question goes to Petitioner's argument about whether this is a tax or not. But that, Skinner says, is beside the point. The standard, intelligible principle standard, is the same for any of Congress's enumerated powers, including the taxing power. Taxing power is no different. Could you respond to counsel opposite was saying that the individual petitioners in here, if the court granted relief, acknowledged would be limited to them. What's your response to the particular claims here of the petitioners? What relief, if the court gave them, what would that be? Well, I think the fact that the idea that it could be limited to the individual petitioners, even if the court's remedy was limited to individual petitioners, that it couldn't have an enormous ripple effect throughout the program. As a practical matter, it would be difficult to figure out how you would back out the first quarter or second quarter, sorry, first quarter 2022 contribution factor for these petitioners as opposed to anybody else. And obviously, if the court were to rule that either on the non-delegation or the private delegation grounds, there would be an enormously disruptive impact on the operation of the program, which even if it could be solved, and a constitutional ruling, I think, could not be solved, at least easily, it would take an enormous amount of time. And in the interim, all of the parties and the interveners in support of the commission have laid this out. All of the carriers and consumers that have relied on this program for decades would find that support withdrawn or disappearing, and their reliance on it, their reliance interests would be totally overtuned. I see my time is up, Your Honor. If the court has no further questions, we ask that the petitioner's petition be dismissed and rejected. Thank you. Thank you. I found it to be interesting that Mr. Lewis, my friend on the other side, led off with a speech about how important universal service is. In our view, that just shows that Congress should be the one setting the outer bounds of that program. Judge Jones, you asked what explains the explosion and the amount raised and the taxing rate each quarter, and in our view, the answer is self-evident. It's the lack of a clearly delineated statutory boundary on the FCC. You asked about all kinds of other services, like satellites and AI technology, and again, I thought my friend on the other side's answer was interesting. It wasn't that the FCC couldn't expand universal service, but it's just that they haven't. And again, the amounts at issue here are irrelevant in our view. The budget, excuse me, the universal service fund now collects almost 25 times the FCC's own annual budget. If this were replicated, Congress would never have to appropriate funds again. What about his final point, the reliance interests, which I read mostly in the government's brief to relate to the suggestion, the threshold suggestion, that the suit is untimely, that the structure that you're saying is unconstitutional was put in place in 1996. Well, so they've abandoned the timeliness argument. But could you just elaborate why it's so conclusive that your suit is timely? I would cite the panel's decision in this case and the Sixth Circuit's decision, which is that every time an agency takes new action, anyone who's affected negatively by it can challenge the constitutionality of it. I think that's established. It's in our reply brief at the panel stage. And is that, do you agree, that's where the reliance interest argument would kick in? I don't really understand the reliance interest argument, given that we agree that any relief could be limited to the petitioners. And again, the declaratory relief itself, I think, would be the most valuable. On the scope of relief, just one final point on that. The government, in these sorts of cases, always comes in and says, please limit the relief to the named plaintiffs or named petitioners. Maybe we're the first petitioners to actually say that's perfectly fine with us. So I think it must be administrable. On the USAC question, Mr. Lewis says that USAC is very bounded by FCC regs. We disagree with that. But I think, more importantly, the point here under this court's decisions and Sierra Club and Rettig is that the FCC actually has to review on the back end. It has to, quote, independently review, analyze, and use its judgment, that's what Sierra Club said, on the back end, to make sure the USAC is doing what the FCC supposedly has told it to do. And again, I think it's quite telling. There's not even an FCC order from the commissioners themselves. Each court are saying, we've looked at these numbers, we've reviewed them, we agree with them. I think the reason that they've done this is probably not because it's so much of a technical issue that the FCC itself couldn't figure out. I'm sure the FCC itself very easily could do this. I think it's more just that it's a political football that no one wants responsibility for. That just emphasizes the importance that Congress itself actually set these limits. Mr. McConnell, Mr. Lewis says that you've admitted that it doesn't matter whether it's a tax or a fee in the analysis. Is that true or accurate? It's not untruthful, but is it inaccurate? I'll say we think we win either way, Your Honor, whether it is a tax or a fee. But we do think it matters. It just makes it much worse that it is a tax. Again, we explained in our briefing why we think that Skinner doesn't go as far as the FCC argues that it does. We think that at most, Skinner just said that taxation is not subject to an extremely high burden in terms of delegation. But again, a minimal objective requirement is something that is certainly not such a high threshold. In fact, we've been able to find any other statute where Congress has given this sort of power without some kind of objective limitation. We keep pointing that out in our briefing. We've got several of these cases going. They've been going for almost two years. The FCC, its interveners, its amici have never written back and said, actually, here's half a dozen statutes just like this, or historical statutes. Are there any cases you're relying on that speak to a cap? In other words, once the money gets to a certain plateau, then kicks in a different level of scrutiny. We're all looking at the same cases of any spoken to there being some arithmetical or dollar amount cap. Once you reach that, then there has to be some other mechanism. If I understand, I think our argument for the objective limitation, Your Honor, comes from NCTA primarily itself, where the court said that the standard language that might pass muster for other non-delegation challenges, like in the public interest, kind of vague phrases like that, raise grave non-delegation concerns when it comes to raising revenue. And so we don't think it's been a coincidence that in JW Hampton and in Skinner, there actually was some sort of objective limitation. I think Mr. Lewis had said that we argue there must be a cap. It's not necessarily that there must be some mathematical cap with a specific number, but there needs to be some indication that Congress itself is setting the limit, rather than the agency setting the limit. It could be a formula. It could be a rate. It could be a cap. These are all things that the Supreme Court has pointed to in cases like Skinner and JW Hampton, and they're all things that are missing from the statute here. Does universal service include data service as well as cell phone? My understanding is, as of now, sometimes, yes. For schools and libraries, I believe, it includes advanced services, I think is the word. And who would decide whether to expand data like however many gigabytes or whatever it is to further? Would it be the USAC or the FCC? The FCC certainly could, but I think that USAC could just as well. But USAC, I mean, USAC determines, quote, needs, right? Right, and plus, it's not a real world looking inquiry. USAC's not trying to figure out how much money was spent on something last quarter. They're trying to project into the future how much money will we need for universal service. But I mean, needs is, that's laden with policy considerations, right? Right, and that's what, those were the case sites I gave in response to Judge Higginson's question earlier about how do we know that USAC isn't just carrying out a ministerial task. The FCC makes it sound like FCC's printing bills and then collecting the checks or something. But you see, excuse me, that USAC is doing that. But USAC is undertaking the difficult policy choices that this court quoted in TOEFC 2, undertaking the imprecise exercise. These are all heavily laden with policy judgments, and that's why, in our view, it's not ministerial. Who has the authority to sue, to claw back the over a billion dollars worth of fraud and waste? Is it the FCC? Is it the USAC? Is it the people who pay the fee on their bill? Who can, who, once they get this annual audit, or perhaps through these other investigations that have revealed all of this waste and fraud, who has the authority to go after the money? To be honest, I'm not entirely sure, Your Honor. I will say that after this court's decision in TOEFC 1, which rejected a portion of the FCC's revenue raising for intrastate revenue, about a decade later, eventually, the FCC said that nobody could get that money back, even though it had been unlawfully collected. I don't think that ended up in litigation, however. On one final point, if I may, Judge Higginson, you asked about seal of law. I think the doctrine you're referring to is what some call a constitutional convergence. Our view is that certainly the combination of factors here render this unconstitutional, but even the individual pieces render it unconstitutional for the reasons we've laid out in our briefing. Thank you. That will conclude the arguments in this case. Judge Ho is participating due to a medical condition who's not physically present, but he is listening to the arguments and he will participate in the conclusion of this case. The court stands adjourned for brief recess.